Timothy P. Stackhouse, AZ State Bar No. 30609
**MILLER, PITT, FELDMAN & MCANALLY, P.C.**
One South Church Ave., Suite 1000
Tucson, Arizona 85701
Phone: (520) 792-3836
Fax: (520) 624-5080
tstackhouse@mpfmlaw.com
me@mpfmlaw.com (designated for minute entries)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Heather Lappin, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| - vs - | |
| Sheriff Chris Nanos, in his official capacity as Pima County Sheriff, | |
| Defendant. | |

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. § 1983 and Arizona common law.

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

3. The acts and omissions giving rise to this action occurred in Pima County, Arizona. Venue is proper in this Court's Tucson Division pursuant to 28 U.S.C. § 1391 and LRCiv 77.1(a).

4. Plaintiff presented her Arizona common law claim to Pima County Sheriff's Department ("PCSD") as required by Ariz. Rev. Stat. § 12-821.01 on April 28, 2025, within the time required by law.

5. PCSD has not made any disposition of the claim, and the claim is deemed denied because more than sixty days have passed since they were filed. Ariz. Rev. Stat. § 12-821.01(E).

6. This Complaint is being filed within the time required by law.

## PARTIES

7. Plaintiff Heather Lappin is a resident of the District of Arizona.

8. Defendant Chris Nanos, in his official capacity as the Pima County Sheriff ("Sheriff Nanos"), is a political subdivision of the State of Arizona and is capable of being sued pursuant to Ariz. Rev. Stat. §§ 12-820(7), 821.01.

9. Sheriff Nanos is liable for the actions, operation, and supervision of the Pima County Sheriff's Department and its employees, agents, and apparent agents in the course and scope of their employment or agency.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

10. Lieutenant Heather Lappin is a career law enforcement officer who served with PCSD for nineteen years.

11. Before the events at issue, Lieutenant Lappin was the Training Section Commander within PCSD. In that role, she oversaw the training of PCSD deputies from all the various bureaus within PCSD.

12. While leading the Training Section, she became aware of widespread discontent among deputies with Sheriff Nanos's leadership.

13. At some time in 2023, Sheriff Nanos personally selected Lieutenant Lappin to serve as the Wellness Section Commander. The Wellness Section was a new undertaking intended to support the wellbeing of PCSD's employees.

14. On September 21, 2023, Lieutenant Lappin filed a Statement of Interest form with the Pima County Elections Department. This was the first public indication of her intention to challenge Sheriff Nanos in the 2024 election.

15. That same day, Lieutenant Lappin separately notified Community Services Division Captain Sharlene Reis and Sheriff Nanos of her decision to run for the office.

16. In the year that followed, Sheriff Nanos and PCSD leadership waged a retaliatory campaign against Lieutenant Lappin's career in order to undermine her candidacy.

### A. Sheriff Nanos and PCSD leadership's false assignment of blame and a punitive transfer of duties arising from a minor training instructor adjustment.

17. First, PCSD leadership escalated a minor instructor-coverage issue into formal discipline intended to intimidate Lieutenant Lappin and damage her reputation within PCSD.

18. On or about early September 2023, Lieutenant Bob Krygier asked Lieutenant Lappin to cover portions of his "General Instructor" school due to a scheduling conflict.

19. By that time, Lieutenant Lappin had taught the General Instructor school approximately seven times and had previously covered for Lieutenant Krygier several other times. Consistent with common practice among instructors in the Training Section, Lieutenant Lappin agreed to cover the classes for him.

20. However, the two lieutenants had different levels of credentials: Krygier was the "subject-matter expert," or Master Instructor, for the General Instructor school, but Lappin was not.

21. Eleven days before she was to cover for Lieutenant Krygier, Lieutenant Lappin informed her chain of command, including Captain Reis, that she would cover portions of the course and that she was not a Master Instructor.

22. Her superiors, who knew that the Arizona Peace Officer Standards and Training Board ("AZPOST") requires a Master Instructor to be present for the entire course, did not intervene or direct her to make different arrangements.

23. Instead, they allowed the class to proceed and then treated the coverage as misconduct to manufacture a basis to discipline Lieutenant Lappin.

24. On September 28, 2023, Captain Christy Anderson, a close confidante of Sheriff Nanos, circulated an email to approximately twenty-three recipients stating the course would not be certified by AZPOST because the Master Instructor was not present for the entire school. Captain Anderson placed blame on Lieutenant Lappin for Lieutenant Krygier's failure to "make the necessary accommodations to ensure compliance with AZPOST for his absence."

25. By publicly blaming Lieutenant Lappin, Captain Anderson intended to malign her reputation among PCSD deputies.

26. On October 30, 2023, Investigations Bureau Chief Jesus Lopez authored a Letter of Counseling ("LOC") accusing Lieutenant Lappin of poor judgment and policy violations related to the coverage issue and blaming her for a purported $76,000 "loss" to the County. Sheriff Nanos signed the LOC; his personal involvement was atypical and inconsistent with PCSD practice.

27. On November 6, 2023, Captain Reis presented the LOC to Lieutenant Lappin and demanded her signature. Lieutenant Lappin refused to sign it without first drafting a written response to the LOC's false and inaccurate account of events.

28. On November 7, 2023, after Lieutenant Lappin submitted the written response disputing the LOC's narrative, Chief Buddy Janes and Captain Reis demanded that she retract her response and threatened consequences, including the revocation of her certification to serve as a law enforcement officer, if she refused. She declined to retract.

29. The next day, Lieutenant Lappin was transferred to the Pima County Adult Detention Center ("the Jail").

30. An immediate transfer like this was unprecedent and departed from PCSD practice, which was to make transfers effective at the end of a pay period to minimize disruption.

31. Lieutenant Lappin received no formal explanation of the reasons for her transfer.

32. The Training Center coverage issue was the start of a broader effort by Sheriff Nanos and PCSD leadership to damage Lieutenant Lappin's reputation and undermine her campaign. Within weeks of filing her Statement of Interest, Captain Anderson had revoked Lieutenant Lappin's teaching authority and command transferred her from the Training Center to the Jail. Although labeled a lateral move, this punitive transfer functioned as a demotion in responsibility, stature, and opportunity.

B. **Routine contact with reporter John Washington in July 2024.**

33. After the abrupt transfer to the Jail, Lieutenant Lappin adapted to her new assignment.

34. Many colleagues at the Jail expressed disillusionment with Sheriff Nanos and supported her candidacy.

35. In July 2024, PCSD Public Information Officer Deputy Adam Schoonover advised Lieutenant Lappin that reporter John Washington of the Arizona *Luminaria* sought to speak with two inmates for an investigative article about conditions at the Jail.

36. Lieutenant Lappin took Mr. Washington's information and agreed to handle the inquiry.

37. New to the Jail post and not having been briefed on any applicable SOPs or media-contact forms, Lieutenant Lappin sought guidance from several peers, including Corrections Lieutenant Mark Hamilton. No one identified a controlling policy, approval form, or notice requirement.

38. Lieutenant Hamilton instructed her to write down the reporter's name and number, give it to each inmate, explain that a journalist wished to speak with them, make clear that contact was the inmate's choice, and recommend that the inmate decline. He did not mention any required forms or procedures. Given the specificity of his advice and his role, Lieutenant Lappin understood these instructions to reflect PCSD practice and policy.

39. Lieutenant Lappin separately met each inmate, explained the request, provided Mr. Washington's phone number on paper, and told each inmate the decision whether to call was theirs. She also stated her recommendation that they do not call Mr. Washington, consistent with Lieutenant Hamilton's guidance.

40. At least one inmate had previously called Mr. Washington and gave an interview, incurring calling charges, and then asked Mr. Washington if he could be reimbursed for those charges.

6

41. On July 18, 2024, Mr. Washington texted Lieutenant Lappin on her department-issued work phone to thank her, reported that an inmate had already reached out, and asked how he might reimburse calling costs.

42. After consulting others at the Jail, Lieutenant Lappin relayed the available options for any member of the public to deposit funds into inmate accounts.

43. Lieutenant Lappin did not arrange, promise, solicit, or handle any money; she provided only general, publicly available information to Mr. Washington on how inmate accounts may be funded. The reimbursement question arose after the call occurred. She does not know whether any reimbursement was ever made.

44. For months thereafter, Lieutenant Lappin continued in her new assignment without incident. Only as her campaign gained traction did Sheriff Nanos and PCSD leadership recast these routine communications to defame Lieutenant Lappin and damage her campaign for Pima County Sheriff.

C. **Retaliatory and baseless administrative leave in October 2024.**

45. Sergeant Aaron Cross, founder of the Pima County Deputy's Organization, has been a vocal critic of Sheriff Nanos. He supported Lieutenant Lappin's candidacy, but he was not a member of her campaign staff, did not work for her campaign, and did not act at her direction.

46. On October 12, 2024, Sergeant Cross engaged in a lawful off-duty protest, holding a sign that stated, "Deputies don't want Nanos." He wore his own clothing that did not bear any PCSD insignia, a holstered pistol, and a pair of handcuffs on his belt.

47. Upon information and belief, supporters of Sheriff Nanos informed Sheriff Nanos and PCSD that a deputy appeared to be campaigning while on duty and in uniform.

48. Captain Juan Carlos Navarro instructed Sergeant Cross not to "look like a deputy" while engaging in political activity.

49. Sergeant Cross agreed to change his attire.

50. On October 13, Sergeant Cross resumed his off-duty protest. He was wearing a gray shirt and was holding the same sign as the day before. By day's end, Sheriff Nanos and PCSD leadership had placed Sergeant Cross on paid administrative leave for "appearing equipped like a law enforcement officer" while protesting.

51. Lieutenant Lappin knew only that Sergeant Cross intended to protest; he did not tell her where he would protest or what he would wear. Her campaign did not direct or coordinate his activities. Its sole involvement was posting a supporter-provided photograph of Sergeant Cross holding his sign to the campaign's Facebook page.

52. The next day, Corrections Bureau Chief Scott Lowing and Captain Benjamin "Paul" Hill summoned Lieutenant Lappin for a meeting.

53. Chief Lowing asked Lieutenant Lappin questions from a prewritten memorandum and directed her to type her answers into a computer on the spot.

54. Neither Chief Lowing nor Captain Hill advised her of any right to representation and did not tell her that she was under investigation.

55. At the conclusion of the meeting, without any evidence that she had coordinated Sergeant Cross's protests, Chief Lowing ordered Lieutenant Lappin to surrender her department-issued phone for examination and to leave the workplace.

56. Later that day, Chief Lowing informed Lieutenant Lappin that she was being placed on administrative leave.

57. Chief Lowing did not explain the basis for the disciplinary action.

58. Lieutenant Lappin later spoke with Chorus Nylander, a news reporter with KVOA, who told her that Sheriff Nanos, through PCSD employees, was accusing her of accepting money to grant journalists access to inmates.

### D. Sheriff Nanos's Defamatory Election-Eve Press Release

59. On October 15, just three weeks before the November 2024 election, Sheriff Nanos issued an official media release concerning Lieutenant Lappin titled "PCSD IA Investigation."

60. The release first stated that one of Lieutenant Lappin's supporters within PCSD, Sergeant Cross, had been placed on administrative leave for "political campaigning while representing [himself] as a department member under the color of authority."

61. The release went on to state that "[i]t is known that Sergeant Cross is collaborating with Lieutenant Heather Lappin on her campaign," and that Lieutenant Lappin was "questioned" about Sergeant Cross's activities.

62. The release also falsely stated that she "colluded with a journalist to facilitate payment to an inmate in exchange for a news story" and announced that PCSD had referred her actions to the Arizona Attorney General and the Federal Bureau of Investigation.

63. The release's phrasing that Lieutenant Lappin had been "questioned," and publicly announcing that PCSD had referred her actions to state and federal authorities implied criminality and election-law violations.

64. The release also falsely stated that Lieutenant Lappin was involved in and condoned Sergeant Cross's off-duty activities, implying that she was violating federal election law.

65. The Arizona *Luminaria* published an article on October 16 expressly denying the statements in Sheriff Nanos's press release. The article explained that Mr. Washington only reimbursed the inmates for the costly phone call charges incurred when he interviewed them previously. The publication affirmed that it "does not and would never pay for sources, interviews, or information."

66. The press release was unprecedented. It is the only instance in which Sheriff Nanos has issued a press release to announce a PCSD employee's placement on administrative leave to conduct an internal investigation.

**E. Rules of Administrative leave and gag order.**

67. On the same day as the publication of the press release, Lieutenant Lappin met with Captain Christy Anderson and Sergeant Stephen Feree. During that meeting, Lieutenant Lappin was advised of the terms of her administrative leave which Chief Lowing had mentioned the prior evening.

68. Captain Anderson and Sergeant Feree directed Lieutenant Lappin to surrender her badge, department-issued firearms, and body-armor vest.

69. She was given a new work phone and told that she must remain at her house and be available by phone from 8:00 a.m. to 4:00 p.m., Monday through Friday.

70. Captain Anderson instructed Lieutenant Lappin that if she wanted to leave her home for any reason during those hours, she was first to report to Captain Anderson and use sick or vacation time to do so.

71. Captain Anderson further ordered Lieutenant Lappin not to speak with anyone at PCSD about the circumstances of her leave, the reasons for her leave, or even the fact that she was placed on leave.

72. PCSD rules, policies, and regulations contain no prohibition on an employee discussing the fact or circumstances of their leave.

73. Under PCSD policy, administrative leave relieves a member from duty. Captain Anderson had no legitimate basis to order Lieutenant Lappin to remain at home and not speak with PCSD personnel about the reason for, or fact of, her leave.

F. **Aftermath continued retaliatory employment actions, and retirement from PCSD**.

74. In early December, the Pima County Superior Court announced the recount results of the election. Lieutenant Lappin lost the race to Sheriff Nanos by 481 votes.

75. Despite the end of the election, Sheriff Nanos and PCSD leadership's harassment and retaliation against Lieutenant Lappin had not concluded.

76. On December 5, 2024, Captain Paul Hill informed Lieutenant Lappin that she was being taken off of administrative leave. Captain Hill also informed her that, while the investigation related to Sergeant Cross's protest was completed, the investigation concerning her interactions with John Washington was still ongoing.

77. Upon her return to work, Lieutenant Lappin was placed at a new desk in a remote area of the Jail and ordered to do nothing but read PCSD's procedures and

guidelines for two weeks, followed by about six weeks of "shadowing" other personnel before resuming full duties.

78. As of March 18, 2025, she had not returned to her prior, regular assignment.

79. Sheriff Nanos and PCSD leadership continued to target Lieutenant Lappin through baseless and retaliatory disciplinary actions.

80. On January 7, 2025, Captain Christy Anderson issued an Acknowledgment of Verbal Counseling ("AVC") to Lieutenant Lappin regarding her use of FMLA between October 18 and November 27, 2024. Lieutenant Lappin had properly used her FMLA benefits while on administrative leave due to stress-related health issues for which she was receiving treatment.

81. On January 21, 2025, Captain Hill presented a formal Letter of Reprimand ("LOR") signed by Sheriff Nanos. The LOR cited various rules and procedures and stated that "evidence of your egregious violations" of PCSD rules and PCADC SOPs had been "discovered and confirmed."

82. Lieutenant Lappin submitted a grievance in response to the LOR. In response to her grievance, Captain Hill admitted that his detailed review found that she "did not facilitate payment for the interviews," and that the discipline concerned authorization, notice to the County Attorney's Office, and documentation requirements for media interviews of inmates.

83. On February 11, 2025, Lieutenant Lappin received notice that her Off-Duty Work Permit, Job Coordinator Permit, and/or Outside Employment Permission was suspended for one year based on the January 22, 2025, discipline. The suspension

occurred shortly before the Cologuard Classic golf tournament, which Lieutenant Lappin had worked for approximately twelve years, including five years as coordinator.

84. On March 7, 2025, Lieutenant Lappin received notice of a new internal investigation related to a letter she wrote to a judge on behalf of a former employee facing sentencing.

85. In total, Lieutenant Lappin has been referred to internal affairs five times since declaring her candidacy in 2023. Before her candidacy, she had one internal-affairs referral during approximately eighteen years of service with PCSD.

86. Sheriff Nanos and PCSD leadership's disproportionate scrutiny of Lieutenant Lappin's is well known amongst PCSD deputies and has even become a running joke.

87. Lieutenant Lappin will retire early as a result of the past and ongoing retaliatory conduct inflicted on her by Sheriff Nanos and PCSD.

<u>COUNT I</u>
(42 U.S.C. § 1983—**First Amendment Retaliation**)
**Defendant Sheriff Chris Nanos**

88. Plaintiff incorporates all the above factual allegations as though set forth herein.

89. A public employee's bid for elective office constitutes a communicative act protected by the First Amendment.

90. Lieutenant Lappin undertook her candidacy for the 2024 elections for Pima County Sheriff as a private citizen and not as part of her official duties as a public employee.

91. Defendant Sheriff Nanos, directly and through PCSD leadership, took adverse employment action against Lieutenant Lappin, including the transfer of new

duties, unwarranted disciplinary investigations, unwarranted assignment of blame, reprimands containing false accusations, repeated and ongoing verbal harassment and humiliation, threats of disciplinary action, and unwarranted disciplinary actions.

92. The actions taken against Lieutenant Lappin would have dissuaded a reasonable public employee from engaging in the same protected activity.

93. Lieutenant Lappin's bid for Defendant Sheriff Nanos's elected office was a substantial or motivating factor for the adverse employment actions taken by Defendant Sheriff Nanos and PCSD leadership.

94. Defendant Sheriff Nanos and PCSD leadership would not have taken the adverse actions alleged herein but for Lieutenant Lappin's candidacy.

95. As a result of Defendant Sheriff Nanos's deprivation of Lieutenant Lappin's constitutional rights, she suffered monetary loss, impairment of reputation, personal humiliation, and mental anguish and suffering.

## COUNT II
### ((42 U.S.C. § 1983—Due Process– Liberty Interest)
### Defendant Sheriff Chris Nanos

96. Plaintiff incorporates all the above factual allegations as though set forth herein.

97. Lieutenant Lappin had a liberty interest in her reputation and standing among the PCSD and community.

98. The October 15, 2024, official media release authored and published by Defendant Sheriff Nanos falsely accused Lieutenant Lappin of "collud[ing] with a journalist to facilitate payment to an inmate in exchange for a news story."

99. The release falsely implied that Lieutenant Lappin had engaged in criminal conduct by referencing "referrals" that Defendant Sheriff Nanos and PCSD leadership made to the Arizona Attorney General's Office and the FBI.

100. The media release, which received extensive coverage in the press, was defamatory, stigmatizing, and accused Lieutenant Lappin of moral turpitude.

101. Lieutenant Lappin was provided no means to challenge the assertions in the media release or otherwise clear her name, in violation of her due process rights.

102. By coupling the retaliatory conduct and adverse employment action with the media release, Defendant Sheriff Nanos deprived Lieutenant Lappin of her constitutional liberty interest in her reputation and standing among the PCSD and community without due process, and tangible interests such as her Off-Duty Work Permit.

103. As a result of Defendant Sheriff Nanos' deprivation of Lieutenant Lappin's constitutional rights, she suffered monetary loss, impairment of reputation, personal humiliation, and mental anguish and suffering.

## COUNT III
### (Common Law Defamation)
### Defendant Sheriff Chris Nanos

104. Plaintiff incorporates all the above factual allegations as though set forth herein.

105. On October 15, 2024, Defendant Sheriff Nanos authored and published an official media release that falsely accused Lieutenant Lappin of "collud[ing] with a journalist to facilitate payment to an inmate in exchange for a news story."

106. The accusation of collusion is a statement of fact that can be proven false. Furthermore, the release's language and the content, tone, context, and apparent purpose of the whole release also present the accusation as a factual statement.

107. The release falsely implied that Lieutenant Lappin had engaged in criminal conduct by referencing "referrals" that Defendant Sheriff Nanos and PCSD leadership made to the Arizona Attorney General's Office and the FBI.

108. At the time of publication, Defendant Sheriff Nanos and PCSD leadership knew the statement was false or acted with reckless disregard of its falsity. Defendant

Sheriff Nanos did or could have reviewed the recorded calls between Mr. Washington and the inmates and did or could have reviewed deposits made to the inmates' accounts. Defendant Sheriff Nanos and PCSD leadership did or could have confirmed from its own records and Lieutenant Lappin's PCSD-issued cellphone that she did not collude with the reporter, arrange any payment, or exchange anything for a news story.

109. The release also falsely implied that Lieutenant Lappin knew of and approved Sergeant Cross's protest attire, that she condoned deputies disregarding orders, and that the conduct implicated the Hatch Act. In fact, Sergeant Cross's clothing was his personal, off-duty attire and Lieutenant Lappin did not direct, approve, or condone any noncompliance.

110. Defendant Sheriff Nanos's false and defamatory statements about Lieutenant Lappin impaired her reputation and standing in the community and caused her to experience emotional distress, humiliation, inconvenience, and anxiety.

## REQUESTED RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant in an amount that will reasonably compensate Plaintiff, plus costs incurred in this action, attorneys' fees pursuant to 42 U.S.C. § 1988, and for such further relief as the Court deems proper.

## JURY DEMAND

Plaintiff requests a jury trial on all claims so triable.

Dated: September 22, 2025.

MILLER, PITT, FELDMAN & MCANALLY, P.C.

By: /s/Timothy P. Stackhouse
Timothy P. Stackhouse
Attorneys for Plaintiffs