BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520.320.1300

Kevin J. Kristick SB#033070
kristick@bosserollman.com
Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Heather Lappin,<br>Plaintiff,<br>- vs -<br>Sheriff Chris Nanos, in his official capacity as Pima County Sheriff,<br>Defendant. | No. 4:25-cv-00528-JAS-GS<br><br>**MOTION FOR SUMMARY JUDGMENT** |

Sheriff Chris Nanos ("Nanos") moves for summary judgment on all claims in Heather Lappin's ("Lappin") Complaint (Doc. 1) ("Complaint"). This Motion is supported by the accompanying Memorandum of Points and Authorities, Defendant's Separate Statement of Material Facts ("DSOF"), and all matters of record, which are incorporated herein by reference. For the reasons set forth below, there is no genuine dispute of material fact and Nanos is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION.

Complaint alleges three counts: (1) First Amendment Retaliation under 42 U.S.C. § 1983, (2) Due Process Liberty Interest Deprivation under 42 U.S.C. § 1983, and (3) Common Law Defamation. All counts fail as a matter of law based upon Lappin's admissions.

Count I contends Lappin's candidacy constituted a communicative act protected by the First Amendment and Nanos retaliated against her because she ran for Sheriff. *See* Doc. 1 at 13-14. Retaliation alleged is "transfer of new duties, unwarranted disciplinary investigations, unwarranted assignment of blame, reprimands containing false accusations,

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

repeated and ongoing verbal harassment and humiliation, threats of disciplinary action, and unwarranted disciplinary actions." Doc. 1 ¶ 91. But Lappin admitted understanding and accepting the reassignment to Pima County Adult Detention Complex ("Jail") and others within Pima County Sheriff's Department ("PCSD") at equal ranks and higher were transferred to the Jail during the same time. Lappin also admitted the conduct and violations referenced in the discipline and then administratively grieved the same discipline, which found Lappin violated rules, policies, and procedures and the progressive discipline given was appropriate and should remain. This defeats liability on all claims, including Count I.

Count II contends Media Release dated October 15, 2024 ("Media Release") falsely accused Lappin of wrongdoing and was defamatory, leaving her with no means to challenge the Media Release and therefore violated her due process rights resulting in a deprivation of liberty interest in her reputation and standing in PCSD and the community. But the Constitution does not provide a remedy for common state law claims including defamation. To find a constitutional violation based on deprivation of liberty interest due to defamation, Lappin must have suffered a loss of tangible interest such as employment, but she did not. *See Paul v. Davis*, 424 U.S. 693, 701-702 (1976). Reputational harm is insufficient. *Id.*

Importantly, Lappin admitted the Media Release was truthful or at a minimum substantially true, and subject to interpretation permitting both Nanos and Lappin, and any reader, to read it differently. Regardless, Lappin never asked for retraction or amendment to the Media Release. Rather, Lappin admitted it "rallied her base" and she was able to campaign "more freely," admitting the conduct alleged in the Complaint "did not cause [her] to surrender her right to run for public office," and she was able to campaign from the date she announced candidacy through election day. This defeats liability on Count II and negates the claim a reasonable employee would have been dissuaded to run for Sheriff. *See* Doc. 1 ¶ 92.

Count III contends the Media Release constituted common law defamation, impairing Lappin's reputation and standing. But Lappin suffered no injury and admitted the Media

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

Release was not false and instead subject to interpretation thereby negating the necessary elements of defamation. Lappin also cannot prove the actual malice element by clear and convincing evidence required for defamation. This defeats liability on Count III.

Discovery confirmed Lappin contemplated retiring from PCSD before the election and no retaliation occurred, admitting "she was not terminated and there were no legal barriers to her continuing to work at PCSD for the remainder of her career." Lappin was treated like other personnel, from placement on administrative leave with pay ("Leave") to discipline received. The Media Release was not defamatory. Lappin suffered no harm and disclosed no evidence of harm. She voluntarily incurred all damages sought in this case, resulting from her own financial situation and not because of the actions of Nanos or PCSD. Lappin's admissions rebut her liability theories and damages claimed, exemplified by her voluntary retirement from PCSD to join Queen Creek Police Department ("QCPD"). The Chief of Police created this position for Lappin following an extensive application process which she passed, enabling her to earn significantly more compensation (approximately $50,000 more) and benefits, and contribute to an additional retirement she could not with PCSD, while also investing her DROP benefit she voluntarily exited to participate in a second retirement.

## II. <u>FACTS</u>.

Lappin retired from PCSD as a Lieutenant with over 20 years of service. *See* DSOF ¶ 1. Terms and conditions of employment with PCSD required her to be aware of, understand, agree, and comply with policies, procedures, rules, and regulations, including those admittedly violated. *Id.* ¶ 2. Lappin was eligible for Deferred Retirement Option Plan ("DROP") in the Public Safety Personnel Retirement System ("PSPRS"), entering DROP before retiring. *Id.* ¶ 3. Lappin could transfer credited time in PSPRS to another PSPRS employer or between Arizona retirement plans like Arizona State Retirement System ("ASRS"). *Id.* ¶ 4. QCPD offers both PSPRS and ASRS to employees. *Id.* ¶ 5.

Before running for Sheriff, Lappin described her relationship with Nanos as "neutral,"

admitting "he didn't treat me badly," she was treated like other employees, and felt supported and received praise and recommendations for assignments. *Id.* ¶ 6. Lappin announced her candidacy for Sheriff in September 2023 and contends her relationship with PCSD became "extremely contentious" but admitted she does not know if Nanos had an active role and does not "have any evidence of that." *Id.* ¶¶ 7-8.

Lappin received a Letter of Counseling dated October 30, 2023 ("LOC") for conduct resulting in Arizona Peace Officer Standards and Training Board ("AZPOST") not certifying a General Instructor (GI) course ("Course") taught to 22 PCSD members and loss of $76,000. *Id.* ¶ 9. Course was not certified because Master Instructor, retired PCSD Lt. Robert Krygier, was not present for all instruction requiring members to retake the Course. *Id.* ¶ 10. Lt. Krygier received a Letter of Reprimand and AZPOST rescinded his Master Instructor certification. *Id.* ¶ 11. Lappin received less discipline than Lt. Krygier for their Course conduct. *Id.* ¶ 12.

Under Pima County Law Enforcement Merit System Rules ("LEMSR"), Lappin responded to the LOC and met with retired PCSD Chief Buddy Janes and retired PCSD Capt. Sharlene Reis on November 6-7, 2023. *Id.* ¶ 13. Lappin admitted the meetings were recorded, transcribed, disclosed and accurate. *Id.* ¶ 14. Lappin admitted taking the LOC "one hundred percent" and "accept[ing] the LOC for the school issue" stating "I should have looked to see if I could cover it," and "[she] messed up" and was "prepared to take responsibility for [her] part in [the] incident. Fully prepared." *Id.* ¶ 15.

During the November 7th meeting, Lappin was reassigned to the Jail and was to swap assignments with PCSD Lt. Mike Moseley. *Id.* ¶ 16. In response, Lappin admitted Capt. Reis, immediate supervisor, had "been wonderful to [her]" and she "will thank [her] from the bottom of [her] heart," and "the transfer [to the Jail], [she got] it one hundred percent." *Id.* ¶ 17. Lappin admitted Lt. Moseley interviewed previously for the position she was reassigned from and he was "100 percent" competent for the position. *Id.* ¶ 18. Lappin admitted Nanos has authority to reassign personnel and other personnel have been reassigned following discipline. *Id.* ¶ 19.

BOSSÉ ROLLMAN PC
3507 North Campbell Avenue, Suite 111
Tucson, Arizona 85719 520-320-1300

Lappin further admitted command staff, which she was a part of, are commonly reassigned and command staff at her rank and higher were reassigned to the Jail during her tenure. *Id.* ¶ 20. Lappin's current employer, QCPD, also commonly reassigns command staff. *Id.* ¶ 21.

While assigned to the Jail in July 2024, Lappin "violat[ed] policy" regarding conduct between a journalist and inmates (*Id.* ¶ 79), admitting:

- John Washington, an Arizona Luminaria reporter, texted Lappin requesting to speak with two inmates and she agreed to speak with the inmates. *Id.* ¶ 22.
- She gave Mr. Washington's contact information to inmates and one inmate called Mr. Washington using the information. *Id.* ¶ 23.
- Mr. Washington, a journalist, requested interviews and wrote news stories and she "figured that he was going to write an article," assuming she "was to facilitate him speaking with the inmates." *Id.* ¶ 24.
- The contact information Lappin provided was used in furtherance of an article and she believed so at the time of providing the information. *Id.* ¶ 25.
- He thanked Lappin for "facilitating" the conversation with one inmate. *Id.* ¶ 26.
- Mr. Washington desired to reimburse the inmate for the call, and Lappin provided him with information to reimburse the inmate. *Id.* ¶ 27.
- Mr. Washington reimbursed inmate's account using information she provided. *Id.* ¶ 28.
- Lappin did not complete Form 879, required and used for journalist's requests for inmate interviews. *Id.* ¶ 29.
- Neither Sheriff Nanos nor Corrections Bureau Chief Scott Lowing were notified of Mr. Washington's request to contact inmates, despite being required. *Id.* ¶ 30.

Nanos learned of Lappin's conduct with Mr. Washington on October 14, 2024, when alerted of suspicious texts on Lappin's phone potentially involving employee misconduct related to an inmate at the Jail which must be investigated. *Id.* ¶ 31. Lappin admitted potential employee misconduct related to an inmate at the Jail must be investigated. *Id.* ¶ 32. Consequently, Lappin

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

was placed on Leave on October 15, 2024. *Id.* ¶ 33.

Conditions of Lappin's Leave were similar to conditions of other PCSD employees on Leave. Her assigned hours and days were identical to her assigned schedule before Leave. *Id.* ¶ 34. She was assigned to her home, required to report within one hour during scheduled hours like every other PCSD employee on Leave. *Id.* ¶ 35. If Lappin was unavailable for personal reasons, she would use applicable leave under policy like every other PCSD employee on Leave. *Id.* ¶ 36. Other PCSD personnel were placed on Leave who did not run for Sheriff and Leave is not discipline or disciplinary action under LEMSRs, Peace Officer Bill of Rights (A.R.S. § 38-1101 *et seq.*), or Pima County Personnel Policy 8-107. *Id.* ¶¶ 37-38.

Conduct alleged in the Complaint, including placing Lappin on Leave, "did not cause [her] to surrender her right to run for public office," and she was able to campaign from the date she announced candidacy through election day. *Id.* ¶ 39. Lappin was free to campaign off duty and did, and admitted campaigning during assigned work hours was not permitted. *Id.* ¶¶ 40-41. Lappin was only on Leave for three days before election because she went on Family Medical Leave Act ("FMLA") on October 18, 2024. *Id.* ¶ 42. Importantly, while on FMLA, Lappin campaigned more than if she had not been on FMLA because she was not subject to restriction against campaigning during assigned work hours. *Id.* ¶ 43. Thus, Lappin admitted campaigning "more freely" compared to if she worked her normal assigned hours and days. *Id.* ¶ 44.

Upon placement on Leave, Lappin denied wrongdoing and told media she would not let placement on Leave stop her from campaigning. *Id.* ¶¶ 45-46. In response to media requests and to correct inaccuracies reported, PCSD issued the Media Release explaining the facts and rationale for placing Lappin on Leave. The Media Release was based on facts available at the time and did not state violations in fact occurred, only mentioning "possible violations" and "possibility of violations." *Id.* ¶¶ 47-48. Lappin admits Nanos never publicly disparaged her, and she never requested amendment or retraction of the Media Release. *Id.* ¶¶ 49-50.

Following issuance of the Media Release:

- Lappin received support with her admitting Nanos' actions "rallied [her] base." *Id.* ¶ 51.
- Lappin received approximately $30,000 in three days after placement on Leave, 25% of her total campaign contributions, admitting she "significantly" outraised Nanos. *Id.* ¶ 52.
- Prominent Democrats and Republications endorsed Lappin. *Id.* ¶ 53.
- Unions, newspapers, businesses, organizations, and leaders endorsed her. *Id.* ¶ 54.
- The media called her campaign "a remarkable comeback." *Id.* ¶ 55.
- Lappin campaigned on Facebook, saying she was "overwhelmed with gratitude for the incredible support received from so many," humbled by support and endorsements from esteemed organizations, and the community came together for her. *Id.* ¶ 56.

Page 2 of the Media Release is the only page pertaining to Lappin. She admitted paragraphs 5 and 7 on page 2 are true, and the remaining paragraphs are subject to interpretation based on background, training, experience, familiarity with words, and influenced by a reader's inner beliefs. *Id.* ¶¶ 57-58. The Media Release is subject to different interpretations – Nanos and Lappin interpret it differently. *Id.* ¶¶ 58-59. Nonetheless, like Nanos, Lappin defines "colluded" on page 2 of the Media Release as "working together," the same definition for "collaborating" as used in the Media Release. *Id.* ¶ 60. "Colluded" was used referencing Mr. Washington and "collaborating" was used referencing Sgt. Aaron Cross. *See* DSOF Ex. N. at Nanos000217. Lappin admitted the following regarding Sgt. Cross:

- Lappin collaborated with Sgt. Cross on her campaign, discussing it weekly if not daily. *Id.* ¶¶ 61, 64.
- Sgt. Cross placed "Heather Lappin for Sheriff" signs for her campaign. *Id.* ¶ 62.
- Sgt. Cross supported and advocated for Lappin's campaign, described as one of her most active supporters and an "8 or a 9" on scale of 0 to 10 with 0 not an active supporter to 10 the most active supporter. *Id.* ¶ 63.

Nanos eventually won the election for Sheriff by less than 500 votes. *Id.* ¶ 65.

On January 7, 2025, Lappin received an Acknowledgment of Verbal Counseling

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

("AVC") for not following policy when utilizing sick leave and notifying her supervisor of clearance to return to work. *Id.* ¶ 66. She admitted two other PCSD personnel received comparable AVC for not complying with sick leave policy. *Id.* ¶ 67.

On January 21, 2025, Lappin received a Letter of Reprimand ("LOR") for her conduct involving Mr. Washington and inmates at the Jail. *Id.* ¶ 68. LOR, the lowest level of formal discipline, was issued after Lappin received the LOC and AVC, both informal disciplines. *Id.* ¶ 69. Lappin admitted violating Rules and Regulations 7.20.D.6 and Jail Standard Operating Procedures I.D.8-9, referenced in the LOR, for not completing Form 879 and complying with policies regarding journalist's request to interview inmates. *Id.* ¶ 70.

Lappin grieved the LOR. *Id.* ¶ 71. A panel of three PCSD members ("Committee") was selected, one by PCSD, one by Lappin, and one mutually by PCSD and Lappin. *Id.* ¶ 72. Each party could strike panel members for partiality concerns and Lappin did so, leading to formation of Committee. *Id.* Before Committee, Lappin admitted involving herself with "reimbursement of inmate costs related to the call [inmate] made to Mr. Washington," facilitating a telephonic conversation about jail conditions and providing inmate with Mr. Washington's phone number, and "fail[ing] to make notifications and complete forms associated with interviews." *Id.* ¶ 73. Lappin "violated policy" and was "accountable" and looking at it now, "[she] would refer to policy and SOPs." *Id.* ¶ 79. She also was "blessed with an incredible career with [PCSD]," which she admitted in February 2025, after the election and receipt of discipline. *Id.* ¶ 74.

Importantly, the LEMSR grievance process permitted witness interviews and presentation of witness testimony and documentary evidence. *Id.* ¶ 75. The Committee's Report covers all issues alleged in the Complaint and accurately describes facts, procedural history and findings including the recommendation affirming the LOR as issued. *Id.* ¶ 76. Committee found "action was taken for cause to correct inappropriate performance or other work-related behavior, after appropriate application of progressive discipline. The degree of disciplinary action is related to the gravity of the improper performance or conduct and the past performance and

conduct of the employee." *Id*. ¶ 77. Pima County agreed, affirming the LOR as issued. *Id*. ¶ 78. Lappin did not appeal the grievance decision. *Id*. ¶ 80.

Following affirmance of the LOR, Lappin's off duty work privileges were subsequently revoked because of the discipline received. *Id*. ¶ 81 Lappin did not ask for reinstatement of those privileges despite knowing revocation was a risk notified of and familiar with. *Id*.

Lappin voluntarily retired from PCSD to join QCPD in November 2025. *Id*. ¶ 82. Before the election, Lappin considered retiring if she did not win the election. *Id*. ¶ 83. Lappin admitted "she was not terminated and there were no legal barriers to her continuing to work at PCSD for the remainder of her career." *Id*. ¶ 84. She does not claim constructive discharge, nor did she do so in her notice of claim or within the one year notice of claim period. *Id*. ¶ 85.

Lappin joined QCPD as a Public Affairs Lieutenant after applying in July 2025, comparable to her position and rank with PCSD. *Id*. ¶ 86. QCPD Chief of Police created this position for Lappin but it still required an "extremely extensive" application and hiring process including application, prescreening, testing, oral board before all QCPD employees, internal background investigation, AZPOST background investigation, second background investigation, interviews with QCPD staff, polygraph, psychological, and medical exams, and approval of Queen Creek City Council. *Id*. ¶ 87. Lappin passed QCPD's requirements, admitting QCPD would not have hired her otherwise. *Id*. ¶ 88.

At QCPD, Lappin earns significantly more compensation (approximately $50,000 more) and benefits, and contributes to additional retirement, having voluntarily exited DROP to participate in ASRS which she is pleased with and still able to invest her DROP benefit. *Id*. ¶ 89. Lappin received hiring bonuses of $5,500, education bonus of $1,500, overtime stipend, front loaded sick and vacation time, and ability to work off duty which she has not exercised. *Id*. ¶ 90. This compensation and benefits were not included as an offset towards damages claimed. *Id*. ¶ 91. Importantly, Lappin would not have received any QCPD compensation or benefits if she remained employed with PCSD, where she could have remained employed earning the

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

compensation she claims as damages. *Id.* ¶ 92.

Lappin was compensated for all work performed at PCSD and is "not calling an economic expert or claiming future lost earnings." *Id.* ¶¶ 93-94. In written discovery, Lappin identified and quantified purported damages, claiming: (a) "Lost compensation / sick leave depletion: $43,730," (b) "Off-duty employment loss: $16,000," (c) "Legal fees (paid + owed): $75,000," (d) "Housing / relocation costs: $29,400," (e) "Forced home sale loss: $50,000," (f) "Transaction costs (realtor + closing): $33,000," (g) "Deferred comp (forced withdrawal + lost growth): $155,000," (h) "Medical-related economic losses: $5,000," and (i) "Additional relocation cost: $20,000." *Id.* ¶ 95. In deposition, Lappin admitted these claimed damages were voluntarily incurred because of a self-created financial situation, including when she retired from PCSD to join QCPD, and not because of or related to the actions of Nanos or PCSD. *Id.* ¶¶ 96-102. Lappin did not ask for reinstatement of privileges needed to perform off duty work, could not provide a basis for damages to claim legal fees paid and owed and "[a]dditional relocation cost: $20,000," or disclosed any supporting information. *Id.* ¶¶ 97-98, 104. The only soft damages claim is the "[m]edical-related economic losses: $5,000" regarding a purported vision issue predating the election which does not limit employment with QCPD. *Id.* ¶ 103. No disclosure regarding said issue has been provided. Importantly, Lappin admitted to "mitigat[ing] all the [claimed] bad that happened." *Id.* ¶ 105.

Regarding reputation and standing following the Media Release, Lappin admitted:

- No one told her they thought less of her. *Id.* ¶ 106.
- Others stated they disagreed with PCSD's actions. *Id.*
- She received support. *Id.*
- Financial contributions to her campaign increased and it "rallied [her] base." *Id.*
- No volunteers left her campaign. *Id.*
- No statements of support for her were withheld. *Id.*

No evidence to the contrary has been disclosed.

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

## III. LAW.

### A. STANDARD FOR GRANTING SUMMARY JUDGMENT.

The Court shall grant summary judgment if "there is no genuine dispute as to any material fact and [Nanos is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Beard v. Banks*, 548 U.S. 521, 529 (2006). Summary judgment is not disfavored, but rather an invaluable piece of the Federal Rules of Civil Procedure protecting Nanos' right to prove a claim has no factual basis. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 24-25 (1st Cir. 2015) (avoid[s] "full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways.").

To defeat summary judgment, there must be an evidentiary basis for a rational factfinder to find in Lappin's favor on a fact affecting the outcome of this case. *See Melton v. Abston*, 84 F.3d 1207, 1219 (11th Cir. 2016); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-252 (1986). It is not enough to survive summary judgment for Lappin to merely produce a "scintilla" of favorable evidence, colorable evidence, or simply imply doubt. *See Anderson*, 477 U.S. at 247-252; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). Nor is it enough for Lappin to produce an affidavit controverted by incontestable evidence. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Rather, Lappin must adequately prove through admissible evidence all essential elements of her case for this Motion to be denied. *See Celotex Corp.*, 477 U.S. at 322-323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). Nanos simply identifying lack of evidence to support Lappin's claims is enough for entry of summary judgment. *See Celotex Corp.*, 477 U.S. at 323.

### B. FEDERAL CLAIMS FAIL UNDER MONELL.

Nanos is sued only in his official capacity, requiring Lappin to comply with *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978) to prove liability under § 1983. *See*

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

DSOF ¶ 107; *Monell*, 436 U.S. at 694-695 (To find official liability under § 1983, an unconstitutional custom or policy violation must occur.). The Court decides if Lappin satisfies *Monell's* policy requirement. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Hammer v. Gross*, 932 F.2d 842, 849 n.4 (9th Cir. 1991).

Lappin admitted no longstanding custom or policy is relied upon for her federal claims. *See* DSOF ¶ 107. Rather, she relies solely on the basis under *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-484 (1986), that Nanos, as purported final policy decisionmaker, caused Lappin's injury. But use of a single instance of a constitutional violation to satisfy *Monell's* policy requirement is "rare" and not the general rule. *See Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153-1154 (9th Cir. 2021) (explaining that in "rare instances, single constitutional violations are so inconsistent with constitutional rights" that they may trigger municipal liability, but only "where 'fault and causation' were clearly traceable to a municipality's legislative body or some other authorized decision maker" (citations omitted)). This "rare" *Monell* exception must involve a final policy decisionmaker's choice among alternatives to serve as a basis for official liability. *See Pembaur*, 475 U.S. at 482-484; *Benavidez*, 993 F.3d at 1153 ("The custom or policy must be a 'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'"). Final decisionmaker liability requires proof that the decisionmaker possessed final policymaking authority concerning the action at issue. *See Pembaur*, 475 U.S. at 481-483. An official's discretion, including Sheriff, to make a final personnel decision does not, without more, establish authority to formulate municipal employment policy. *Id.* at 481-482 & n.12; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126–27 (1988).

Conduct alleged in the Complaint is synonymous with a personnel decision, which does not establish policy under *Monell*. *See Pembaur*, 475 U.S. at 481-482 & n.12. Complaint does not allege otherwise or explain a basis for final decisionmaker authority. Lappin

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

admitted she has no evidence Nanos had an active role. *See* DSOF ¶ 8. Summary judgment is warranted on Counts I and II on this basis alone. Additionally, Nanos did not make choices having alternatives that wrongfully caused an injury and Lappin has not disclosed otherwise. Rather, Lappin received discipline, admitted wrongdoing, understood and accepted reassignment to Jail, and campaigned more than she could if not placed on Leave. *See* Section II, *supra.* The Media Release would not have been issued but for media requests and to correct inaccuracies. *See* DSOF ¶ 47. Thus, there was no choice but to issue the Media Release. This is an additional independent basis to dismiss Counts I and II on summary judgment.

*Monell* also requires an underlying constitutional violation. *See Lockett v. Cnty. of L.A*, 977 F.3d 737, 741 (9th Cir. 2020). But there are no constitutional violations considering Lappin's admissions described herein, warranting summary judgment on Counts I and II.

C. LAPPIN'S FIRST AMENDMENT RIGHTS WERE NOT VIOLATED.

For First Amendment Retaliation, Lappin must prove: (1) she spoke on a matter of public concern; (2) as a private citizen rather than under her official duties; and (3) her speech was a substantial or motivating factor in an adverse employment action. *See Eng v. Cooley*, 552 F.3d 1062, 1070–1071 (9th Cir. 2009). If Lappin makes that showing, Nanos avoids liability by demonstrating he had adequate justification for treating Lappin differently from other members of the public or that he would have taken the same action absent the protected speech. *Id.* at 1071–1072; *Barone v. City of Springfield*, 902 F.3d 1091, 1098 (9th Cir. 2018). An employment action is adverse if it is reasonably likely to deter an employee from engaging in protected speech. *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003).

Lappin did not suffer an adverse employment action, admitting conduct alleged in the Complaint "did not cause [her] to surrender her right to run for public office," and she was able to campaign from the date she announced her candidacy through election day. *See* Section II, *supra*; DSOF ¶ 84. This is not a constructive discharge case, confirmed in discovery when Lappin admitted "she was not terminated and there were no legal barriers to her

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

continuing to work at PCSD for the remainder of her career." *Id.* ¶ 85. Thus, Lappin was free to stay at PCSD and earn the compensation she seeks damages for and avoid the costs associated with retiring to join QCPD. *Id.* ¶ 92. But she chose not to.

Discipline Lappin received was unrelated to her candidacy for Sheriff and issued following conduct Lappin admitted was wrongful and where she accepted discipline. *See* Section II, *supra.* Lappin's admissions show she was reassigned like others in PCSD, received discipline either less than or equal to others who acted similarly, and her Leave was identical to the Leave of other PCSD personnel who did not run for Sheriff. *Id.* Lappin was able to campaign "more freely" and exercised her right under LEMSR to administratively grieve discipline which found the discipline appropriate and followed progressive discipline. *See* Section II, *supra*; DSOF ¶¶ 44, 71, 77. Importantly, this administrative process covered all claims and issues alleged in the Complaint. *See* DSOF ¶ 76.

Lappin was not retaliated against, warranting summary judgment on Count I.

D. <u>LAPPIN DID NOT SUFFER DEPRIVATION OF A LIBERTY INTEREST</u>.

For a procedural due process claim, Lappin must prove "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by [Nanos]; and (3) lack of process." *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008). Deprivation of liberty interest requires suffering a loss such as financial, tangible interest, or other injury. *See Paul*, 424 U.S. at 701-702. Defamation without loss of tangible interest such as employment does not constitute deprivation of liberty interest. *Id*. Reputational harm is insufficient. *Id.*

Complaint alleges Lappin could not "challenge the assertions in the [M]edia [R]elease or otherwise clear her name." Doc. 1 at 14-15. This is untrue because Lappin denied wrongdoing upon placement on Leave, told media it would not stop her from campaigning, and never asked for retraction or amendment to the Media Release. *See* DSOF ¶¶ 45-46, 49. Lappin continued to campaign "more freely" and receive substantial, immediate support

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

following placement on Leave and issuance of the Media Release. *See* Section II, *supra*. The Media Release admittedly explained the facts and rationale for placement on Leave and was based on facts available at the time and did not state violations in fact occurred, only mentioning "possible violations" and "possibility of violations." *See* DSOF ¶¶ 47-48. Nanos never publicly disparaged Lappin and Lappin failed to exhaust her administrative remedies asking for reinstatement of off duty work privileges following revocation, despite knowing revocation occurs following receipt of discipline like an LOR. *See* DSOF ¶¶ 50, 81, 97. Lappin alleged no other tangible interest loss in Count II. *See* Doc. 1 ¶ 102.

Lappin has disclosed no evidence her "reputation and standing" were harmed. Her admissions prove otherwise and show the Media Release is substantially true, if not true. *See* Section II, *supra*.

Lappin suffered no loss and at the very least, did not suffer a financial or tangible loss necessary for deprivation of liberty interest. Summary judgment is appropriate on Count II.

E. <u>LAPPIN ADMITTED THE MEDIA RELEASE IS NOT FALSE</u>.

For defamation, Lappin must prove by a preponderance of the evidence: (a) Nanos made, said, or wrote a defamatory statement of fact about Lappin, (b) the statement was false, (c) Nanos made, said, or wrote the statement to a third person, (d) the statement caused Lappin to be damaged, and by clear and convincing evidence (e) at the time the statement was made, said, or written, Nanos knew that the statement was false or acted in reckless disregard of whether the statement was true or false. *See* RAJI (Civil) 7th Defamation ("RAJI") 1A; *Currier v. W. Newspapers, Inc.*, 175 Ariz. 290, 292-293 (1993). "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach [Lappin's] honesty, integrity, virtue, or reputation." *Turner v. Devlin*, 174 Ariz. 201, 203-204 (1993); *see also* RAJI 2. A statement is not defamatory if it cannot be provably false. *Turner*, 174 Ariz. at 205. Element (e) of defamation requires Lappin to prove Nanos had "serious doubts as to whether the statement is true or false, or …

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

consciously disregard[ed] whether it [wa]s true or false. *See* RAJI 4A; *Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 487 (1986). "Truth is a complete defense to a defamation claim", where "slight inaccuracies do not make a statement false if the statement is substantially true. A statement is substantially true if the statement differs from the truth only in insignificant details." RAJI 3; *see also Currier*, 175 Ariz. at 293.

PCSD issued the Media Release, not Nanos, and thus defamation fails against Nanos warranting summary judgment on Count III. *See* DSOF ¶ 47. The Media Release is also not provably false because it admittedly stated investigation was ongoing and only mentioned "possibility of violations" and "possible violations" and not that violations occurred. *Id.* ¶¶ 57, 48. Moreover, the Media Release is true, or at least substantially true, warranting summary judgment on Count III. Comparing Lappin's admissions herein to the text of the Media Release confirms the truth of the statement and rebuts the position taken in the Complaint. *See generally* Doc. 1 at 15-16; compare with Section II, *supra.* Lappin defined "colluded" as "working together," confirming use of the word intended for the Media Release which is not the purported view argued in Count III. *See* DSOF ¶ 60; compare to Doc. 1 at 14-15. The Media Release was based on information available at the time within one day of placing Lappin on Leave, which she too admitted must be investigated, and done in response to media requests and to correct reported inaccuracies. *See* Section II, *supra.* Investigation into potential conduct could not admittedly have been completed in one day, considering the investigation was ongoing and Lappin went on FMLA prohibiting further investigation into the alleged conduct. *See* Section II, *supra.* These admissions rebut the actual malice element of defamation warranting summary judgment on Count III.

Regarding Sgt. Cross' attire at issue in the Media Release, Judge Collins in *Cross, et al. v. Nanos, et al.*, Case No. 4:24-cv-00506-RCC, found Sgt. Cross violated the Hatch Act. *See* Order (Doc. 11) (Oct. 28, 2024) at 2 ("The Court can conclude … that Plaintiff Cross was certainly attempting to look like an on-duty deputy. It appears to the Court, the use of a

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

firearm, handcuffs, tactical gear, and boots was done with this intention, and the Hatch Act precludes such conduct."). Except for the preceding sentence, the Media Release does not support paragraph 109 of Complaint which should be disregarded in its entirety.

Lappin also suffered no harm warranting summary judgment on Count III. *See infra*.

F. <u>LAPPIN SUFFERED NO HARM AND THEREFORE DOES NOT HAVE STANDING</u>.

Lappin's admissions demonstrate she suffered no harm and does not have standing to maintain this lawsuit, warranting summary judgment on all claims. The requirement of a concrete injury to satisfy standing was explained in *Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 2205 (2021):

> Importantly, this Court has rejected the proposition that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 578 U. S., at 341, 136 S.Ct. 1540. As the Court emphasized in *Spokeo*, "Article III standing requires a concrete injury even in the context of a statutory violation." *Ibid*.

Lappin admitted to voluntarily incurring the economic harm claimed, resulting from personal decisions unrelated to Nanos or PCSD, and has disclosed no evidence otherwise. *See* Section II, *supra*. The only soft damage claim is for a vision issue predating the election, which is not supported by any disclosure, and which admittedly does not limit Lappin's current employment following extensive interviews, background, and medical, physical, and psychological exams. *Id.* This case boils down to Lappin contemplating retirement before the election, losing the election, and voluntarily retiring for another comparable opportunity with no break in service. *Id.* She makes more economically than she otherwise could have at PCSD. *Id.* She admits she could have stayed at PCSD earning the compensation she seeks damages for and avoiding the costs associated with accepting the new out of town employment. *Id.*

## IV. <u>CONCLUSION</u>.

For the reasons contained herein, Nanos is entitled to an order from this Court granting summary judgment on all counts in the Complaint. If the Court disagrees, Nanos requests the Court order potential damages limited only to nominal damages. Nanos requests an award of his attorney's fees and costs incurred under 42 U.S.C. § 1988 and Fed R. Civ. P. 54(d).

BOSSÉ ROLLMAN PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

RESPECTFULLY SUBMITTED November 3, 2026.

BOSSÉ ROLLMAN PC

By: /s/ Kevin J. Kristick
Kevin J. Kristick
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 3, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Timothy P. Stackhouse
STACKHOUSE LAW, PLC
Suite 02
534 North Stone Avenue
Tucson, Arizona 85705
tim@stackhouselawaz.com
Attorneys for Plaintiff

By: /s/ Bille Jo Labby